UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :     SEALED INDICTMENT

            -v.-                        13 CRIM 972

PETER AMREIN,

            Defendant.              :

- - - - - - - - - - - - - - - - - - - x

<u>COUNT ONE</u>
<u>(Conspiracy)</u>

The Grand Jury charges:

<u>The Defendant and Associated Entities and Persons</u>

1.    At all times relevant to this Indictment, PETER
AMREIN, the defendant, was a citizen and resident of Switzerland
who provided wealth management services to various clients,
including U.S. taxpayers.

2.    From at least in or about 1998, up to and
including in or about 2006, PETER AMREIN, the defendant, served
as a client advisor at a Swiss bank headquartered in Zurich,
Switzerland ("Swiss Bank No. 3"), and in that capacity, provided
wealth management services to various individuals, including
U.S. taxpayers.  Among the services AMREIN provided to those
U.S. taxpayers was advice and assistance in maintaining
undeclared accounts at Swiss banks.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12|17|13

3.     From in or about 2006, up to and including at least in or about 2012, PETER AMREIN, the defendant, served as an asset manager at an asset management firm based in Zurich, Switzerland (the "Swiss Asset Management Firm"), and in that capacity, continued to provide wealth management services to clients, including advice and assistance to U.S. taxpayers in maintaining undeclared accounts at Swiss banks.

4.     At all times relevant to this Indictment, Wegelin & Co. ("Wegelin") was a Swiss bank that provided private banking services to and maintained undeclared accounts for U.S. taxpayers.

5.     At all times relevant to this Indictment, three other Swiss private banks ("Swiss Bank No. 1," "Swiss Bank No. 2," and "Swiss Bank No. 4") provided private banking services to and maintained undeclared accounts for U.S. taxpayers.

6.     At all times relevant to this Indictment, Edgar Paltzer ("Paltzer"), a co-conspirator not named as a defendant herein, was an attorney based in Zurich, Switzerland who practiced in the areas of "international private client work, wealth transfer planning, successions, trusts and Foundation[s], on-shore and off-shore structures, private banking[,] and individual taxation." Paltzer served as a financial intermediary for U.S. taxpayers who maintained undeclared accounts in Switzerland.

7.   In or about February 2009, UBS AG ("UBS"), a Swiss bank that provided private banking services to and maintained undeclared accounts for U.S. taxpayers, entered into a deferred prosecution agreement with the United States Department of Justice in connection with its participation in a scheme to defraud the United States and the Internal Revenue Service ("IRS").

## Obligations of United States Taxpayers With Respect to Foreign Financial Accounts

8.   Citizens and residents of the United States who have income in any one calendar year in excess of a threshold amount ("U.S. taxpayers") are obligated to file a U.S. Individual Income Tax Return, Form 1040 ("Form 1040"), for that calendar year with the IRS.  At all times relevant to this Indictment, Form 1040 required U.S. taxpayers to report their income from any source, regardless of whether the source of their income is inside or outside the United States.  In addition, on Schedule B of Form 1040, the filer must indicate whether "at any time during [the relevant calendar year]" the filer had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account."  If the U.S. taxpayer answers that question in the affirmative, then

the U.S. taxpayer must indicate the name of the particular country in which the account is located.

9.   Separate and apart from the obligation to file Forms 1040 that report all income, U.S. taxpayers who have a financial interest in, or signature authority over, a financial account in a foreign country with an aggregate value of more than $10,000 at any time during a particular calendar year are required to file with the IRS a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1 ("FBAR").  The FBAR for any calendar year is required to be filed on or before June 30 of the following calendar year.  In general, the FBAR requires that the U.S. taxpayer filing the form identify the financial institution with which the financial account is held, the type of account (bank, securities, or other), the account number, and the maximum value of the account during the calendar year for which the FBAR is being filed.

10.   An "undeclared account" is a financial account maintained outside the United States and beneficially owned by a U.S. taxpayer, but that is not disclosed to the IRS on Schedule B of Form 1040 or on an FBAR, and the income generated in the account is not reported to the IRS on Form 1040.

**The Conspiracy**

11.   From at least in or about 1998 through in or about at least 2012, PETER AMREIN, the defendant, conspired with

4

various U.S. taxpayers, including U.S. taxpayers in the Southern District of New York, and others known and unknown, to ensure that his U.S. taxpayer clients could hide the U.S. taxpayers' Swiss bank accounts, and the income generated in those accounts, from the taxation authority of the United States, the IRS, via false and fraudulent federal income tax returns.

### Means and Methods of the Conspiracy

12.   Among the means and methods by which PETER AMREIN, the defendant, and his co-conspirators would and did carry out the conspiracy were the following:

a.   AMREIN and his co-conspirators opened, maintained, and/or managed undeclared accounts on behalf of U.S. taxpayers at various Swiss banks, including at Wegelin, Swiss Bank No. 1, Swiss Bank No. 2, Swiss Bank No. 3, and Swiss Bank No. 4.

b.   AMREIN and his co-conspirators used sham "foundations" and other entities formed under the laws of countries such as Liechtenstein to conceal, from the IRS and others, the ownership by U.S. taxpayers of accounts established at Wegelin, Swiss Bank No. 1, Swiss Bank No. 2, Swiss Bank No. 3, Swiss Bank No. 4, and other Swiss banks, as well as the income generated in those accounts.

c.   U.S. taxpayers who conspired with AMREIN filed false and fraudulent Forms 1040, which, among other

things, failed to report their interest in their undeclared accounts and the income generated in their undeclared accounts.

d.     U.S. taxpayers who conspired with AMREIN failed to file FBARs identifying their undeclared accounts.

e.     AMREIN and his co-conspirators transferred the assets in the undeclared accounts from certain Swiss banks to others in order to enable U.S. taxpayer clients to continue to maintain undeclared accounts in Switzerland.

f.     AMREIN traveled to the United States, and caused his U.S. taxpayer clients to travel to Switzerland, in order to conduct business relating to the undeclared accounts, including reviewing account statements, which, were deliberately not sent to the U.S. taxpayers in the United States.

g.     AMREIN and his co-conspirators helped U.S. taxpayers repatriate funds to the United States from their undeclared accounts in Switzerland in a manner designed to ensure that U.S. authorities did not discover these undeclared accounts.

### AMREIN's U.S. Taxpayer Clients

13.     At various times relevant to this Indictment, PETER AMREIN, the defendant, opened, maintained, and managed undeclared accounts at Swiss banks for various U.S. taxpayers holding millions of dollars in undeclared assets.  Details for

several U.S. taxpayers for whom AMREIN opened, maintained, and managed undeclared accounts are set forth more fully below.

### The Amrein/Paltzer Clients

14.   In or about 1998, PETER AMREIN, the defendant, began to work with Paltzer in the management of undeclared accounts for a number of U.S. taxpayers (collectively, the "Amrein/Paltzer Clients").   AMREIN requested that Paltzer establish sham foundations, organized under the laws of non-U.S. countries such as Liechtenstein, so that the assets of the Amrein/Paltzer Clients could be maintained in accounts held in the names of these foreign foundations rather than in the names of the Amrein/Paltzer Clients themselves.   AMREIN made this request in order to help conceal from the IRS his U.S. taxpayer clients' undeclared accounts in Switzerland.

15.   When PETER AMREIN, the defendant, first began to work with Paltzer, AMREIN was a client advisor at Swiss Bank No. 3.   At that time, the Amrein/Paltzer Clients either already had undeclared accounts at Swiss Bank No. 3, or wanted to open undeclared accounts at Swiss Bank No. 3.   At the request of AMREIN, Paltzer created sham foundations for the Amrein/Paltzer Clients.   Once a sham foundation was created, undeclared accounts held in the names of these sham foundations were opened at Swiss Bank No. 3 for the benefit of the Amrein/Paltzer Clients.

16. Typically, in connection with the creation of each of the sham foundations, PETER AMREIN, the defendant, and Paltzer met with the U.S. taxpayer client. At that initial meeting, AMREIN and Paltzer received a copy of the client's U.S. passport, along with other account opening documentation. Thereafter, AMREIN invested and manage the money in each of the clients' undeclared accounts. Paltzer sat on the boards of the various sham foundations that nominally held the undeclared accounts and, in that capacity, helped AMREIN arrange for distributions from the accounts to the Amrein/Paltzer Clients upon their request.

17. In or about 2006, PETER AMREIN, the defendant, left his position as a client advisor at Swiss Bank No. 3, and began to work as an asset manager at the Swiss Asset Management Firm. When AMREIN left Swiss Bank No. 3, he transferred the undeclared accounts of the Amrein/Paltzer Clients to Swiss Bank No. 4. At Swiss Bank No. 4, the accounts continued to be held in the names of the sham foundations created by Paltzer, and continued to be hidden from the IRS. AMREIN continued to manage the accounts, and Paltzer continued to assist AMREIN in arranging for distributions from the accounts to the Amrein/Paltzer Clients.

18. In or about 2008, it became publicly known that UBS was being investigated by United States law enforcement for

helping U.S. taxpayers maintain undeclared accounts.  Because of the investigation of UBS, Swiss Bank No. 4 informed PETER AMREIN, the defendant, that Swiss Bank No. 4 was going to close the undeclared accounts of the Amrein/Paltzer Clients.  In order to assist his clients in continuing to maintain undeclared accounts, AMREIN searched for other banks in Switzerland that would maintain undeclared accounts of the Amrein/Paltzer Clients.  AMREIN found two such banks:  Swiss Bank No. 1 and Swiss Bank No. 2.

19.  In or about 2008, PETER AMREIN, the defendant, discussed with Paltzer the possibility of moving the undeclared accounts to either Swiss Bank No. 1 or Swiss Bank No. 2. Paltzer, who had recently moved a different group of undeclared accounts to Swiss Bank No. 2, suggested that AMREIN move the undeclared accounts of the Amrein/Paltzer Clients to Swiss Bank No. 1.

20.  In or about 2009, PETER AMREIN, the defendant, opened the undeclared accounts for the Amrein/Paltzer Clients at Swiss Bank No. 1 in the name of sham foundations and transferred his clients' assets from Swiss Bank No. 4 to these accounts at Swiss Bank No. 1.  As part of the account opening process for these accounts at Swiss Bank No. 1, AMREIN helped compile and execute certain account opening documentation.  This account opening documentation included a copy of the U.S. taxpayer

clients' U.S. passport, as well as a "Form A," which identified the name of the true beneficial owner of the account, that client's address in the United States, and that client's status as a U.S. citizen or permanent resident alien.

21.   On or about August 4, 2010, Paltzer had a conversation with two high-ranking executives at Swiss Bank No. 1 (the "Swiss Bank No. 1 Executives") about certain of the Amrein/Paltzer Clients' undeclared accounts.  In Paltzer's conversation with the Swiss Bank No. 1 Executives, the Swiss Bank No. 1 Executives acknowledged that these accounts, which had been moved to Swiss Bank No. 1 in or about 2009, were not U.S. tax-compliant, that is, they were undeclared.  Despite the fact that the Swiss Bank No. 1 Executives understood these account were undeclared, Swiss Bank No. 1 continued to maintain these undeclared accounts until 2011 and 2012.

22.   The Amrein/Paltzer Clients included the following U.S. taxpayer clients, whose accounts are discussed in further detail below.

### Client 1

23.   In or about 1998, a citizen of the United States ("Client 1") became interested in opening an undeclared bank account in order to conceal his assets.  Client 1 has resided in Cumming, Georgia since approximately 2001 and, prior to that, Client 1 resided in Boston, Massachusetts.

24.   In or about 1998, Client 1 attended a conference in Bermuda, during which PETER AMREIN, the defendant, gave a presentation explaining various methods to conceal assets. After the presentation, Client 1 spoke with AMREIN, who suggested that Client 1 contact AMREIN if Client 1 ever traveled to Europe.

25.   In or about 1999, Client 1 in fact traveled to Europe and contacted PETER AMREIN, the defendant, who was then working at Swiss Bank No. 3.  AMREIN proposed to Client 1 that Client 1 open an undeclared account in order to hide Client 1's assets.  AMREIN further proposed to Client 1 that Client 1 maintain an undeclared account in the name of a sham foundation for the purpose of further ensuring that the account not be discovered.  AMREIN then contacted Paltzer to request his assistance in creating the sham foundation.

26.   In or about 2000, Paltzer, at the request of PETER AMREIN, the defendant, created a sham foundation for Client 1 called the WASP Foundation, which was organized under the laws of Liechtenstein.  AMREIN then assisted Client 1 in opening an undeclared account at Swiss Bank No. 3 that was held in the name of this sham foundation.  AMREIN managed the assets in the account, while Paltzer served on the board of the sham foundation, and in that capacity, assisted AMREIN in making distributions from the account to Client 1.  In connection with

the account's creation, Client 1 traveled to Zurich, Switzerland, and provided a copy of his U.S. passport to AMREIN and Paltzer.

27.   PETER AMREIN, the defendant, instructed Client 1 not to talk about the undeclared account in order to maintain its secrecy.  At AMREIN's direction, Client 1 hid the existence of the account from others.  Although Client 1 initially set up the account with only $5,000 to $10,000, Client 1 subsequently added money to the account by periodically sending endorsed checks through the mail to AMREIN.  Client 1's account reached a high value of approximately $650,000.

28.   From in or about 2000, up to and including 2001, Client 1 was residing in Boston, Massachusetts.  During that time, Client 1 periodically met with PETER AMREIN, the defendant, at restaurants in Boston to discuss Client 1's undeclared account.  From in or about 2001, up to and including in or about 2012, Client 1 lived in Cumming, Georgia.  During that time, Client 1 periodically met with AMREIN at the Sheraton Airport Hotel in Atlanta, Georgia to discuss Client 1's undeclared account.  During these in-person meetings, AMREIN showed Client 1 summary sheets relating to Client 1's undeclared account, which did not identify Client 1 by name.  AMREIN explained to Client 1 that AMREIN purposely did not bring account statements to their meetings, because such statements

were incriminating and it was therefore not a good idea to bring them to the United States.

29.  In or about 2006, PETER AMREIN, the defendant, left Swiss Bank No. 3, and began working at the Swiss Asset Management Firm.  At that time, AMREIN created an undeclared account at Swiss Bank No. 4 for Client 1, held in the name of the same sham foundation, and transferred Client 1's assets from the undeclared account at Swiss Bank No. 3 to the new undeclared account at Swiss Bank No. 4.

30.  Between in or about 2006 and in or about 2009, Client 1 withdrew funds from his undeclared account at Swiss Bank No. 4 on several occasions.  In order to provide Client 1 with access to funds in his undeclared account, PETER AMREIN, the defendant, caused Swiss Bank No. 4 to send checks to Client 1 in the United States.  When discussing these checks, AMREIN and Client 1 used coded terms in order to obscure the true nature of their discussions.  Additionally, pursuant to advice that AMREIN provided to Client 1, checks sent by AMREIN to Client 1 were often for amounts just under $10,000 each.  AMREIN explained to Client 1 that checks under $10,000 would draw less scrutiny.

31.  For example, on or about September 14, 2007, Client 1 wrote a letter to PETER AMREIN, the defendant, stating that Client 1 "would appreciate receiving four more of your

13

books like you did before when you sent me three books."  On or about September 25, 2007, in response to Client 1's request, the Swiss Asset Management Firm wrote a letter to Paltzer regarding Client 1's request.  The September 25, 2007 letter requested that Paltzer ask Swiss Bank No. 4 to send four checks to Client 1 in the amounts of $9,830, $9,810, $9,770, and $9,750 each. Client 1 was referenced in the September 25, 2007 letter only by his first and last initial.  On or about September 28, 2007, in response to this request, Paltzer sent a letter to a banker at Swiss Bank No. 4, asking the banker to issue four checks in the amount of $9,830, $9,810, $9,770, and $9,750, and to forward them directly to the "beneficial owner" of the account, i.e., Client 1.

32.   In or about 2009, Swiss Bank No. 4 informed PETER AMREIN, the defendant, that because of the investigation of UBS, Client 1's undeclared account at Swiss Bank No. 4 would have to be closed.  In response, AMREIN created a new undeclared account for Client 1 at Swiss Bank No. 1 that was held in the name of the same sham foundation, and transferred Client 1's undeclared assets from Swiss Bank No. 4 to the new undeclared account at Swiss Bank No. 1.  When the new undeclared account was opened at Swiss Bank No. 1, a "Form A" was created, which identified the name of the true beneficial owner of the account, Client 1, and

further identified Client 1 as a U.S. citizen with an address in Cumming, Georgia.

33.   In or about 2009, shortly after the opening of Client 1's undeclared account at Swiss Bank No. 1, Client 1 decided to close the account because he had learned of the investigation of UBS.   At or around that time, Client 1 told PETER AMREIN, the defendant, that Client 1 had concerns because of the U.S. law enforcement investigation into UBS for maintaining undeclared accounts for U.S. taxpayers.   In response, AMREIN told Client 1 that Client 1 was not at risk for prosecution because UBS was a special situation.   AMREIN also discouraged Client 1 from entering the IRS's voluntary disclosure program and disclosing his undeclared account to the IRS.

34.   Beginning in or about July 2009, PETER AMREIN, the defendant, arranged for the contents of Client 1's undeclared account at Swiss Bank No. 1 to be systematically disbursed to Client 1 in a manner designed to ensure that the account was not discovered.   In furtherance of this effort, and at AMREIN's request, Paltzer sent a letter to Swiss Bank No. 1, dated July 20, 2009, in which Paltzer asked Swiss Bank No. 1 to issue four checks per month, in amounts between $8,000 and $9,900, to the "beneficial owner" of the account, that is, Client 1.   The July 20, 2009 letter instructed Swiss Bank No. 1

15

that the checks were "to be sent directly to the beneficial owner via mail to his residence address, which is already known by you." Moreover, on or about January 4, 2010, Paltzer sent a letter to the client advisor who handled Client 1's undeclared account at Swiss Bank No. 1 (the "Swiss Bank No. 1 Client Advisor"). In the letter, Paltzer asked the Swiss Bank No. 1 Client Advisor to empty the contents of Client 1's undeclared account by sending "as many checks as necessary (amounts smaller than $9,900)" from the account to the "BO [beneficial owner]" of the account, that is, Client 1.

35. On or about December 9, 2011, Client 1 entered the voluntary disclosure program and disclosed his undeclared account to the IRS.

36. On Client 1's Forms 1040 for the tax years 2000 through and including 2010, Client 1 did not report Client 1's interest in, or signature or other authority over, Client 1's undeclared account. Moreover, for these years, Client 1 did not file an FBAR disclosing Client 1's undeclared account at any of the Swiss banks where it was located, including Swiss Bank No. 1.

### Clients 2 and 3

37. In or about 1998, two citizens of the United States who were married to one another ("Client 2" and "Client 3") opened an undeclared account with PETER AMREIN, the

16

defendant, at Swiss Bank No. 3.  At relevant times, Client 2 has resided in Brooklyn, New York.

38.  Paltzer, at the request of PETER AMREIN, the defendant, created a sham foundation for Client 2 and Client 3 called the Pecuniae Kythos Foundation, which was organized under the laws of Liechtenstein.  The undeclared account for Client 2 and Client 3 was held in the name of this sham foundation. AMREIN managed the assets in the account, while Paltzer served on the board of the sham foundation, and in that capacity, assisted AMREIN in making distributions from the account to Client 2 and Client 3.

39.  In or about 2006, PETER AMREIN, the defendant, left Swiss Bank No. 3, and began working at the Swiss Asset Management Firm.  At that time, AMREIN created a new undeclared account at Swiss Bank No. 4 for Client 2 and Client 3 that was held in the name of the same sham foundation.  AMREIN then moved the assets of Client 2 and Client 3 from the undeclared account at Swiss Bank No. 3 to the new undeclared account at Swiss Bank No. 4.  While at Swiss Bank No. 4, Client 2's and Client 3's account reached a high value of at least $1.3 million.

40.  In or about 2008, the assets held in the undeclared account at Swiss Bank No. 4 were divided in half, because Client 2 and Client 3 had divorced.  Shortly thereafter, Paltzer sent Client 3 a check for approximately $660,000, which

represented Client 3's half of the assets in the undeclared account. Paltzer caused this check to be issued by Swiss Bank No. 4, and then sent the check to Client 3 at an address in Manhattan, New York. Thereafter, Client 2 became the sole owner of the assets held in the undeclared account at Swiss Bank No. 4.

41. In or about 2009, Swiss Bank No. 4 informed PETER AMREIN, the defendant, that because of the investigation of UBS, Client 2's undeclared account at Swiss Bank No. 4 would have to be closed. In response, AMREIN created a new undeclared account for Client 2 at Swiss Bank No. 1 that was held in the name of the same sham foundation, and transferred Client 2's undeclared assets from Swiss Bank No. 4 to the new undeclared account at Swiss Bank No. 1. When the undeclared account was moved to Swiss Bank No. 1, a "Form A" was created, which identified the name of the true beneficial owner of the account, Client 2, and further identified Client 2 as a U.S. citizen with an address in Brooklyn, New York.

42. Following the movement of the undeclared account to Swiss Bank No. 1, PETER AMREIN, the defendant, arranged for the assets in the account, then valued at approximately $660,000, to be gradually distributed to Client 2 in a manner designed to prevent the IRS from discovering that Client 2 maintained an account in Switzerland. Specifically, AMREIN

arranged for a series of transfers to be made from the undeclared account to another undeclared bank account controlled by Client 2 in Budapest, Hungary (the "Budapest Account"). For instance, on or about December 17, 2009, Client 2 sent a fax to AMREIN asking that a wire transfer of $60,000 be made from his undeclared account at Swiss Bank No. 1 to the Budapest Account. Later the same day, Paltzer sent a letter to the Swiss Bank No. 1 Client Advisor, requesting that Swiss Bank No. 1 execute the wire transfer.

43.   Approximately six months later, on or about June 21, 2010, Client 2 sent a fax to PETER AMREIN, the defendant, asking AMREIN to transfer another $40,000 from his undeclared account at Swiss Bank No. 1 to the Budapest Account. The next day, on or about June 22, 2010, Paltzer sent a letter to the Swiss Bank No. 1 Client Advisor, requesting that Swiss Bank No. 1 execute the wire transfer.

44.   In or about June 2011, Client 2's undeclared account at Swiss Bank No. 1 was closed.

45.   On Client 2's Forms 1040 for the tax years 1998 through and including 2011, Client 2 did not report Client 2's interest in, or signature or other authority over, Client 2's undeclared account. Moreover, for these years, Client 2 did not file an FBAR disclosing Client 2's undeclared account at any of

the Swiss banks where it was located, including Swiss Bank No. 1.

46.   Likewise, on Client 3's Forms 1040 for the tax years 1998 through and including 2008, the year when Client 3 closed out Client 3's interest in the undeclared account, Client 3 did not report Client 3's interest in, or signature or other authority over, Client 3's undeclared account.  Moreover, for these years, Client 3 did not file an FBAR disclosing Client 3's undeclared account at any of the Swiss banks where it was located.

## Clients 4 and 5

47.   In or about 2001, two citizens of the United States who were siblings ("Client 4" and "Client 5") opened an undeclared account with PETER AMREIN, the defendant, at Swiss Bank No. 3.  At relevant times, Client 4 and Client 5 have resided in Las Vegas, Nevada.

48.   Paltzer, at the request of PETER AMREIN, the defendant, created a sham foundation for Client 4 and Client 5 called the Uversa Foundation, which was organized under the laws of Liechtenstein.  The undeclared account for Client 4 and Client 5 was held in the name of this sham foundation.  AMREIN managed the assets in the account, while Paltzer served on the board of the sham foundation, and in that capacity, assisted

AMREIN in making distributions from the account to Client 4 and Client 5.

49.   In or about 2006, PETER AMREIN, the defendant, left Swiss Bank No. 3, and began working at the Swiss Asset Management Firm.   At that time, AMREIN created a new undeclared account at Swiss Bank No. 4 for Client 4 and Client 5 that was held in the name of the same sham foundation.   AMREIN then moved the assets of Client 4 and Client 5 from the undeclared account at Swiss Bank No. 3 to the new undeclared account at Swiss Bank No. 4.

50.   At Swiss Bank No. 4, the undeclared account was broken into two parts, Category A and Category B.   Client 5 withdrew funds from Category B of the account, in the form of checks from Swiss Bank No. 4 that were each for an amount under $10,000.   For instance, on or about May 4, 2009, at the request of PETER AMREIN, the defendant, Paltzer wrote a letter to a banker at Swiss Bank No. 4, asking that Swiss Bank No. 4 issue four checks from Category B of the account: a $5,000 check to Capital One; an $8,000 check to American Express; a $9,000 check to Client 5; and a $7,000 check to Client 5.   The letter further instructed the banker to send the checks by Federal Express to the "beneficial owner of [C]ategory B stated in the due diligence form," that is, Client 5.

51.  In or about 2009, Swiss Bank No. 4 informed PETER
AMREIN, the defendant, that because of the investigation of UBS,
Client 4's and Client 5's undeclared account at Swiss Bank No. 4
would have to be closed.  In response, AMREIN created a new
undeclared account for Client 4 and Client 5 at Swiss Bank No. 1
that was held in the name of the same sham foundation, and
transferred the undeclared assets of Client 4 and Client 5 from
Swiss Bank No. 4 to the new undeclared account at Swiss Bank No.
1.  When the undeclared account was moved to Swiss Bank No. 1, a
"Form A" was created, which identified the names of the true
beneficial owners of the account, Client 4 and Client 5, and
further identified Client 4 and Client 5 as U.S. citizens with
an address in Las Vegas, Nevada.  Like the previous undeclared
account at Swiss Bank No. 4, the undeclared account at Swiss
Bank No. 1 was broken into two parts, Category A and Category B.
While at Swiss Bank No. 1, Client 4's and Client 5's account
reached a high value of at least $2.9 million.

52.  Following the creation of the undeclared account
at Swiss Bank No. 1 for Client 4 and Client 5, Client 5 withdrew
money from Category B of the undeclared account on numerous
occasions in the form of checks issued by Swiss Bank No. 1,
which were often for an amount under $10,000 each.  Client 5
asked PETER AMREIN, the defendant, to arrange for these
withdrawals, and Paltzer, in turn, sent letters to the Swiss

Bank No. 1 Client Advisor requesting that Swiss Bank No. 1 issue the requested checks.  For instance, Paltzer sent letters to the Swiss Bank No. 1 Client Advisor on or about March 24, 2010, June 28, 2010, and February 8, 2012.  In each of these letters, Paltzer requested that Swiss Bank No. 1 send three checks of $8,000, each from Category B of the undeclared account, to Client 5 in Las Vegas, Nevada.

53.  Following the creation of the undeclared account at Swiss Bank No. 1, Client 4 informed PETER AMREIN, the defendant, that Client 4 was not interested in participating in the voluntary disclosure program.  Thereafter, in or about the summer of 2011, Paltzer asked AMREIN to obtain written documentation from Client 4 that demonstrated Client 4's awareness of the voluntary disclosure program.  Accordingly, on or about August 16, 2011, Client 4 wrote a letter stating, in part, "Thank you for the update on the voluntary disclosure program."  Client 4 further stated in her letter that she was authorizing AMREIN and Paltzer to transfer her undeclared account to Swiss Bank No. 2.  Prior to sending the letter, Client 4 had asked AMREIN to move Category A of the undeclared account from Swiss Bank No. 1 to Swiss Bank No. 2.

54.  In or about March 2012, rather than an account being opened at Swiss Bank No. 2 for Client 4, the remaining assets held in Category A of the undeclared account at Swiss

Bank No. 1, approximately $2,470,000, were transferred at Client 4's request to another account controlled by Client 4 in Belize City, Belize.  The transfer occurred after Paltzer wrote a letter to the Swiss Bank No. 1 Client Advisor, dated March 12, 2012, asking that the Swiss Bank No. 1 Client Advisor execute the transfer and close Category A of the undeclared account.

55.  In or about April 2012, Category B of the undeclared account was closed.  Prior to the closure of Category B, at the request of PETER AMREIN, the defendant, Paltzer sent a check to Client 5 in Las Vegas, Nevada, for approximately $434,375, which represented the remainder of the balance in Category B.

56.  On Client 4's Forms 1040 for the tax years 2001 through and including 2012, Client 4 did not report Client 4's interest in, or signature or other authority over, Client 4's undeclared account.  Moreover, for these years, Client 4 did not file an FBAR disclosing Client 4's undeclared account at any of the Swiss banks where it was located, including Swiss Bank No. 1.

57.  Likewise, on Client 5's Forms 1040 for the tax years 2001 through and including 2012, Client 5 did not report Client 5's interest in, or signature or other authority over, Client 5's undeclared account.  Moreover, for these years, Client 5 did not file an FBAR disclosing Client 5's undeclared

account at any of the Swiss banks where it was located, including Swiss Bank No. 1.

### Client 6 and Client 7

58.   In or about 1999, two citizens of the United States who were married ("Client 6" and "Client 7") opened an undeclared account with PETER AMREIN, the defendant, at Swiss Bank No. 3.  At relevant times, Client 6 and Client 7 have resided in Danbury, Connecticut.

59.   Paltzer, at the request of PETER AMREIN, the defendant, created a sham foundation for Client 6 and Client 7 called the Nitsch Foundation, which was organized under the laws of Liechtenstein.  The undeclared account for Client 6 at Swiss Bank No. 3 was held in the name of this sham foundation.  AMREIN managed the assets in the account, while Paltzer served on the board of the sham foundation, and in that capacity, assisted AMREIN in making distributions from the account to Client 6.

60.   On or about June 22, 2000, Paltzer sent a letter to PETER AMREIN, the defendant, stating, in substance and in part, that the sham foundation that Paltzer had created for Client 6 and Client 7 "does not desire to disclose its identity to the U.S. tax authorities," and that, "[f]or this reason, we hereby order you not to hold or acquire any U.S. securities."

61.   On or about May 10, 2004, while Client 6 and Client 7 maintained the undeclared account at Swiss Bank No. 3,

Paltzer sent a letter to PETER AMREIN, the defendant, at Swiss Bank No. 3, asking that distributions from the undeclared account routinely be made to Client 6. Specifically, in the letter, Paltzer asked AMREIN to transfer approximately $7,000 every two months from the undeclared account to an account controlled by Client 6 in Danbury, Connecticut, so that approximately $42,000 in total was transferred out of the undeclared account each year. Paltzer also indicated in the letter to AMREIN that although each of the transfers should be in the approximate amount of $7,000, the amounts of the checks should not be exact round numbers.

62. In or about 2006, PETER AMREIN, the defendant, left Swiss Bank No. 3 and began working at the Swiss Asset Management Firm. At that time, AMREIN created a new undeclared account at Swiss Bank No. 4 for Client 6 and Client 7 that was held in the name of the same sham foundation. AMREIN then moved the assets of Client 6 and Client 7 from the undeclared account at Swiss Bank No. 3 to the new undeclared account at Swiss Bank No. 4.

63. In or about 2009, Swiss Bank No. 4 informed PETER AMREIN, the defendant, that because of the investigation of UBS, Client 6 and Client 7's undeclared account at Swiss Bank No. 4 would have to be closed. In response, AMREIN created a new undeclared account for Client 6 and Client 7 at Swiss Bank No. 1

that was held in the name of the same sham foundation, and transferred the undeclared assets of Client 6 and Client 7 from Swiss Bank No. 4 to the new undeclared account at Swiss Bank No. 1. When the undeclared account was opened at Swiss Bank No. 1, a "Form A" was created, which identified the names of the true beneficial owners of the account, Client 6 and Client 7, and further identified Client 6 and Client 7 as U.S. citizens with an address in Danbury, Connecticut.

64. Following the creation of the undeclared account at Swiss Bank No. 1, Paltzer, at the request of PETER AMREIN, the defendant, communicated with the Swiss Bank No. 1 Client Advisor about gradually distributing the assets from the undeclared account in a manner that facilitated the concealment of the account from the IRS. For instance, on or about July 17, 2009, Paltzer sent a letter to the Swiss Bank No. 1 Client Advisor, asking Swiss Bank No. 1 to send monthly checks from the account for $5,000 each to the daughter of Client 6 and Client 7 (the "Daughter"), at an address in Plainville, Connecticut. On or about the same date, Paltzer sent a second letter to the Swiss Banker No. 1 Client Advisor, requesting that Swiss Bank No. 1 transfer $8,000 from the account every two months to an account controlled by Client 6 in Tampa, Florida.

65. In or about July 2010, Client 6's and Client 7's undeclared account at Swiss Bank No. 1 was closed. Shortly

prior to the account's closure, Paltzer, at the request of
Client 6, sent a letter to the Swiss Bank No. 1 Client Advisor,
dated July 15, 2010.  In this letter, Paltzer requested that
Swiss Bank No. 1 transfer all the assets from the undeclared
account into another account at Swiss Bank No. 1, which was held
in the name of the Daughter.

66.  On Client 6's Forms 1040 for the tax years 1999
through and including 2010, Client 6 did not report Client 6's
interest in, or signature or other authority over, Client 6's
undeclared account.  Moreover, for these years, Client 6 did not
file an FBAR disclosing Client 6's undeclared account at any of
the Swiss banks where it was located, including Swiss Bank No.
1.

67.  Likewise, on Client 7's Forms 1040 for the tax
years 1999 through and including 2010, Client 7 did not report
Client 7's interest in, or signature or other authority over,
Client 7's undeclared account.  Moreover, for these years,
Client 7 did not file an FBAR disclosing Client 7's undeclared
account at any of the Swiss banks where it was located,
including Swiss Bank No 1.

### Other Amrein Clients

68.   In addition to opening, maintaining, and managing undeclared accounts for the Amrein/Paltzer Clients as described above, PETER AMREIN, the defendant, opened, maintained, and managed undeclared accounts at Swiss banks for other U.S. taxpayer clients, including the U.S. taxpayer clients set forth below.

### Client 8

69.   In or about the late 1990s, a citizen of the United States ("Client 8"), was introduced to PETER AMREIN, the defendant, through an individual who had been working with AMREIN to handle his/her family investments in Switzerland. Client 8 has resided in New York, New York since approximately 2005 and, prior to that, Client 8 resided in Philadelphia, Pennsylvania.

70.   In or about 2007, Client 8 decided to open an undeclared account at Wegelin Bank in Switzerland with the assistance of PETER AMREIN, the defendant.  Client 8 opened the undeclared account because Client 8 had inherited a life insurance policy from Client 8's relative in or about 1994, which matured in or about 2007.  Once the policy matured, it was valued at approximately $238,000, and Client 8 wanted a place to invest these funds.

71.   At the time that Client 8 opened the undeclared account with PETER AMREIN, the defendant, Client 8 was a resident of Manhattan, New York.  Client 8 executed all of the account-opening documentation for his undeclared account at Wegelin in Manhattan, New York, and then sent the paperwork, including a copy of Client 8's U.S. passport, to AMREIN's office at the Swiss Asset Management Firm in Zurich, Switzerland.

72.   PETER AMREIN, the defendant, managed and had full control over the investments in Client 8's undeclared account at Wegelin.

73.   Between in or about 2007 and in or about 2011, PETER AMREIN, the defendant, met with Client 8 in Manhattan, New York to discuss Client 8's undeclared account on approximately four occasions.  These meetings typically lasted from thirty minutes to an hour and took place at either a restaurant or a hotel lobby.  One of the meetings between AMREIN and Client 8 took place at a hotel in Manhattan, New York.  AMREIN and Client 8 also spoke over the phone, usually for the purpose of setting up their in-person meetings.

74.   In or about 2011, PETER AMREIN, the defendant, told Client 8 that his undeclared account would have to be moved out of Wegelin.  Shortly thereafter, Client 8 entered the voluntary disclosure program and disclosed his account to the IRS.

75. On Client 8's Forms 1040 for the tax years 2007 through and including 2010, Client 8 did not report Client 8's interest in, or signature or other authority over, Client 8's undeclared account. Moreover, for these years, Client 8 did not file an FBAR disclosing Client 8's undeclared account at Wegelin.

### Client 9

76. In or about 1999, a citizen of the United States and resident of Las Vegas, Nevada ("Client 9") was introduced to PETER AMREIN, the defendant. Client 9 generated income through, among other things, Client 9's development of a website that reported celebrity-related news.

77. In or about 2007, in light of the potential exposure to litigation from celebrities who were displeased with Client 9's website, Client 9 contacted PETER AMREIN, the defendant, about opening an undeclared account in Switzerland. Client 9 then met with AMREIN in Switzerland for the purpose of opening the account. The account opening documents were signed in Switzerland and, thereafter, AMREIN met with Client 9 in Las Vegas, Nevada to finalize arrangements related to the Swiss account. When the account was opened, AMREIN made a copy of Client 9's U.S. passport and documented Client 9's address in Las Vegas.

78.   Client 9's undeclared account was initially opened by PETER AMREIN, the defendant, at Swiss Bank No. 4.   The undeclared account was not held in the name of Client 9, but rather, was held in the name of a sham Panamanian corporation called WebMedia Publishing, SA, which AMREIN controlled.   Client 9's initial investment in the undeclared account was approximately $250,000, which grew to approximately $500,000 within a few months of the account's creation.

79.   In or around 2009, as discussed above, Swiss Bank No. 4 informed PETER AMREIN, the defendant, that it was going to close the undeclared accounts of certain U.S. clients because of the investigation of UBS.   Thereafter, in or about 2010, AMREIN created a new undeclared account for Client 9 at Wegelin that was held in the name of the same sham Panamanian corporation, and transferred Client 9's undeclared assets from Swiss Bank No. 4 to the new undeclared account at Wegelin.

80.   Approximately one year later, in or about 2011, PETER AMREIN, the defendant, told Client 9 that AMREIN would have to move Client 9's undeclared account from Wegelin to Swiss Bank No. 2, so that Client 9 would be able to access the funds in the account.   AMREIN then created a new undeclared account for Client 9 at Swiss Bank No. 2 that was held in the name of the same sham Panamanian corporation, and transferred Client 9's

undeclared assets from Wegelin to the new undeclared account at Swiss Bank No. 2.

81. From in or about 2007 through in or about 2011, Client 9 met with PETER AMREIN, the defendant, once or twice a year, either in the United States or in Zurich, Switzerland, to discuss Client 9's undeclared accounts. During these meetings, Client 9 and AMREIN discussed investments and investment strategies. At the meetings, AMREIN also provided Client 9 with bank statements, which contained the names of banks and account numbers, but did not contain any information regarding who owned the account. AMREIN also instructed Client 9 not to tell anyone about the existence of his undeclared accounts.

82. In or about 2012, Client 9 entered the voluntary disclosure program and disclosed his account to the IRS.

83. On Client 9's Forms 1040 for the tax years 2007 through and including 2010, Client 9 did not report Client 9's interest in, or signature or other authority over, Client 9's undeclared account. Moreover, for these years, Client 9 did not file an FBAR disclosing Client 9's undeclared account.

### Statutory Allegations

84. From at least in or about 1998 through at least in or about 2012, in the Southern District of New York and elsewhere, PETER AMREIN, the defendant, together with others known and unknown, willfully and knowingly did combine,

33

conspire, confederate, and agree together and with each other to defraud the United States of America and an agency thereof, to wit, the IRS, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Section 7201, and Title 26, United States Code, Section 7206(1).

85.   It was a part and an object of the conspiracy that PETER AMREIN, the defendant, together with others known and unknown, willfully and knowingly would and did defraud the United States of America and the IRS for the purpose of impeding, impairing, obstructing, and defeating the lawful governmental functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, to wit, federal income taxes.

86.   It was further a part and an object of the conspiracy that PETER AMREIN, the defendant, together with others known and unknown, willfully and knowingly would and did attempt to evade and defeat a substantial part of the income tax due and owing to the United States of America from clients of AMREIN's who were U.S. taxpayers, in violation of Title 26, United States Code, Section 7201.

87.   It was further a part and an object of the conspiracy that PETER AMREIN, the defendant, together with others known and unknown, willfully and knowingly would and did make and subscribe returns, statements, and other documents,

which contained and were verified by written declarations that they were made under the penalties of perjury, and which AMREIN, together with others known and unknown, did not believe to be true and correct as to every material matter, in violation of Title 26, United States Code, Section 7206(1).

### Overt Acts

88.  In furtherance of the conspiracy and to effect the illegal objects thereof, PETER AMREIN, the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   In or about 2009, AMREIN met with Client 1 in Atlanta, Georgia to discuss Client 1's undeclared account.

b.   On or about December 17, 2009, Client 2 sent a fax to AMREIN requesting that $60,000 be transferred from Client 2's undeclared account to an account in Budapest, Hungary.

c.   In or about 2008, Paltzer mailed a check drawn on Client 3's undeclared account to an address in New York, New York.

        d.    In or about 2010, AMREIN met with Client 8

in New York, New York to discuss Client 8's undeclared account

(Title 18, United States Code, Section 371.)


_____                    _____
FOREPERSON                           .      PREET BHARARA
                                            United States Attorney

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

-v.-

### PETER AMREIN,

Defendant.

### SEALED INDICTMENT

13 Cr. ___ (__)

(18 U.S.C. § 371)

_____
PREET BHARARA
United States Attorney.

**A TRUE BILL**

_____
Foreperson.

12/17/13   FILED INDICTMENT

COTJ using